UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

Loyde W. Brackeen
and Billie Brackeen                            Plaintiffs

v.                                             CIVIL ACTION NO. 3:07 CV 040-M-A

BNSF Railway Company,
a Delaware Corporation,
Maquin G. Avila, and
Patrick Silva                                  Defendants

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANT BNSF' MOTIONS IN LIMINE

## I.    INTENT OR PURPOSE OF THE FELA.

While Plaintiff does not intend to engage in an historical discussion regarding the

enactment of the FELA, the jury would benefit from being informed that such an act exists and

that it is Plaintiff's proper recourse under federal law for securing compensation for his on-the-

job railroad injury.  Accordingly, an explanation to the jury of the basic principles behind the

FELA and the purpose for the Act's passage would be helpful and would reduce the risk of

prejudice to Plaintiff should the jury make any incorrect assumptions about why he is suing his

employer in court.

One of the few cases that address this issue is *Martin v. Burlington N.  R.R. Co.*, 614 P.2d

1203 (Or. App. 1980).  In *Martin*, the court upheld a jury instruction on the basic purpose of the

FELA, implying that an instruction consistent with the U.S. Supreme Court case of *Sinkler v.*

*Missouri Pac. R. Co.*,[1] is appropriate in FELA cases.  In *Sinkler*, the court explained that the

FELA was an avowed departure from the rules of common law, and "was a response to the

_____

[1] 356 U.S. 326 (1958).

special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety." *Id*. at 330. The Court went on to note that:

> The cost of human injury, an escapable expense of railroading, must be borne by someone, and the FELA seeks to adjust that expense equitably between the worker and the carrier. The Senate Committee which reported the Act stated that it was designed to achieve the broad purpose of promoting "the welfare of both employer and employee, by adjusting the losses and injuries inseparable from industry and commerce to the strength of those who in the nature of the case ought to share the burden." S. Rep. No. 460, 60th Cong., 1st Sess. 3.

In short, the FELA is a law that the average juror will never have heard of prior to involvement in this case. Accordingly, the jury should receive some sort of explanation as to why Plaintiff is seeking redress in court for an on-the-job railroad injury, and a brief explanation of the basic purpose of this Act from the Court or counsel, paralleling the discussion in *Sinkler*, would be appropriate.

## II. EVIDENCE REGARDING ELEVATED LEVELS OF DANGER IN THE RAILROAD INDUSTRY.

One of the issues to be resolved in this case is the nature and extent of the injuries suffered by Plaintiff as a result of the October 18, 2006, incident. Plaintiff claims that he has been permanently disabled both physically and mentally from returning to his former position with the railroad. Defendant, in turn, contends that he may be able to return either to his old job or in some alternative capacity. Thus, an issue bearing directly on the damage question is whether Plaintiff could in fact return to work for Defendant BNSF performing railroad work in any capacity. Furthermore, Plaintiff suffers from PTSD as a result of the crossing accident involved in this case. Evidence of the dangers inherent in the railroad industry in general are highly relevant to this issue.

It cannot be disputed that there are numerous dangers involved in railroad work. Such dangers include working on and in close proximity to heavy and rapidly moving equipment and the potential for even slight error to result in catastrophic injuries. Evidence of these dangerous conditions, which Plaintiff confronted on a daily basis prior to the subject incident and which he would once again be forced to confront upon any potential return to railroad work, is clearly relevant to the issue of whether or not he could return to his former position (or any position with the railroad). This is particularly true, as here, when the Plaintiff suffers from PTSD and dangerous "triggers" are directly relevant to the issue of his ability to return to the railroad environment. By moving to preclude references to the dangers inherent in railroading, Defendant seeks to present a sterile picture to the jury. However, the issue is not one that can be considered in a vacuum. Rather, it must be viewed with due regard for the dangerous working conditions to which Plaintiff would be forced to return.

In short, evidence of dangerous conditions present in railroad work is relevant to the damages issues in this case, and is therefore admissible pursuant to Fed. R. Evid. 402. Additionally, the substantial probative value of this evidence is not "substantially outweighed by the danger of unfair prejudice," and thus may not be excluded under Fed. R. Evid. 403.

## III. EVIDENCE OF PLAINTIFF'S FINANCIAL HARDSHIP

Plaintiff does not intend to introduce evidence or testimony that he has suffered a financial hardship as a result of the injuries he received in this incident.

## IV. PLAINTIFF IS NOT OFFERING NEEDLESS CUMULATIVE TESTIMONY ON PTSD

As an initial matter, Defendant does not identify the experts that are allegedly offering needless cumulative evidence and does not set forth what evidence is cumulative and how it is

cumulative.  Further, the cumulative nature of the expert testimony is a determination better made at trial after the parties have actually called the experts to testify.  <u>Lofton v. McNeil Consumer & Specialty Pharmaceuticals</u>, 2008 WL 4878066, 11 (N.D.Tex.,2008).

Fed. R. Evid. 703 states that relevant evidence should be excluded if it is *needless* presentation of cumulative evidence. Id. (emphasis added).  The rule does not state that all cumulative evidence should be excluded.  It is only when the cumulative evidence is needless.  Plaintiff is not offering cumulative evidence.

In this case as a result of the train truck collision, Plaintiff saw a treating psychologist Susan Ackerman Ross, Ph.D. and a treating psychiatrist   Dr. Rice.  Plaintiff then retained Dr. Ochberg, an independent medical practitioner, to give an expert opinion.

The testimony of Ackerman-Ross and Rice is not cumulative because they are trained in different medical fields.  Testimony of both a psychologist and psychiatrist has been found admissible and not cumulative.  <u>Harmeyer v. Dohm,</u>  2007 WL 4294667, 4 (E.D.La., 2007).  Ackerman-Ross is a psychologist and Rice is a psychiatrist.  Therefore, the testimony is not cumulative.

Ackerman-Ross and Rice are treating doctors.  As such, much of their testimony will be factual and based upon their independent care and treatment of Mr. Brackeen.  Because the care and treatment each treating doctor provided is different the testimony will not be cumulative.  <u>See</u> <u>Wallace v. King</u>, 2005 WL 6198591, 1 (E.D.La.,2005).

Dr. Ochberg is a specially retained independent medical doctor in the field of psychiatry.  Plaintiff has the right to hire an independent expert just has Defendant has retained an independent expert.  Retained experts are given more and different forms of information which they review and bases their opinions.  The federal rules of civil procedure acknowledge the

distinction between a retained and treating doctor. See Fed. R. Evid. 26. Treating doctors such as Ackerman-Ross and Rice do not receive the same information as specifically. A treating doctor typically can not and does not wade through all the past and present legal documents such as depositions. As an example, both Plaintiff's and Defendant's retained experts were provided the Plaintiff's deposition. The treating doctors do not have this document. Finally, treating doctors can be called by any of the parties, not just Plaintiff.

## V.  EVIDENCE THAT THIS IS NOT A WORKERS COMPENSATION CASE

*See* Plaintiffs' Motion In Limine No. 5 seeking to allow Plaintiff to inform the jury that this is not a workers compensation case.

## VI.  DEFENDANT'S FINANCIAL SIZE OR STATUS.

Plaintiff does not intend to use the Defendant's financial size, solvency, or ability to pay a verdict to invoke passion or prejudice in the jury.

## VII.  PLAINTIFF MAY PROPERLY OFFER EVIDENCE OF MEDICAL EXPENSES INCURRED BY HIM.

Defendant BNSF seeks to preclude Plaintiff from introducing at trial any and all evidence relating to doctor, hospital, and other medical and health care provider bills paid through the health care plan negotiated between Defendant and Plaintiff's union. While Plaintiff agrees with BNSF in principle on its stated position, Defendant ignores the real reason why the medical bills remain relevant.

Costs of Plaintiff's past medical expenses are properly admitted at trial as evidence of the costs of medical expenses Plaintiff is reasonably expected to incur in the future as a result of his injuries. *See, Minzer, Damages in Tort Actions,* Vol. II, Sec. 9.55[4] Matthew Bender, 1994; *Hart v. Higgins*, 379 A.2d 155 (Me. 1977); *City of Rosenburg v. Ronken*, 616 S.W.2d 346 (Tex.

Cir. App. 1981). Indeed, in some jurisdictions, it has been held to constitute reversible error to permit a jury to award damages for future medical expenses where there is no evidence as to past medical costs which could be used as a yardstick for determining future expenses. *Baros v. Kazmiercewk*, 68 N.M. 421, 362 P.2d 798 (1961). Evidence of such matters is further relevant and admissible in that it would assist in the jury's assessment of Plaintiff's pain and suffering.

The rule is clear. In determining a plaintiff's future medical costs for treatment and care, the jury may very properly base its verdict upon an assessment of the total costs or expenses involved, and may properly consider the total medical expense incurred by Plaintiff since the time of his injury. 88 A.L.R.2d 482; *Houghton v. Blackships, Inc.*, 462 F.2d 788 (5th Cir. 1972) (Jones Act); *Rosso v. Mattson Navigation Co.*, 486 F.2d 1018 (9th Cir. 1973) (Jones Act).

## VIII. EVIDENCE OF SAFER METHODS IS CLEARLY ADMISSIBLE IN FELA CASES.

Contrary to Defendant BNSF's argument, evidence of the existence of safer equipment or safer alternatives of performing work is clearly admissible in FELA cases. In *Lindsey v. Louisville & Nashville R. Co.,* 775 F.2d 1323 (5th Cir. 1985), for example, the court allowed Plaintiff's expert to testify as to his opinion of safer methods which could be used to load and unload railroad cars. As stated by the court in *Campbell v. Chesapeake & Ohio Ry. Co.,* 36 Ill.App.2d 276, 183 N.E.2d 736 (1962):

> The admissibility of evidence of a safer method is a matter within the discretion of the trial court. (Citations deleted.)

Sound exercise of judicial discretion in the case at hand would clearly permit the jury to hear testimony of safer alternatives which the Defendant could have reasonably employed to avoid the sort of danger which existed here. *Lindsey, supra; Campbell, supra.*

**IX.     PLAINTIFF'S REPUTATION FOR SAFETY OR CHARACTER.**

Plaintiff does not intend to submit evidence of past specific safety or character activities. However, a general review of Plaintiff's work history with the BNSF is appropriate to reveal that during the course of his railroad career he had not been prevented from effectively performing his job duties and that he has always been a dedicated employee. Following this incident, however, he has been unable to return to railroad work.

Such evidence is illustrative of the vast disparity between Plaintiff's pre and post-accident levels of functioning, and is therefore relevant to demonstrate the severity of the injuries and damages he has suffered as a result of this accident. Because evidence of Plaintiff's history as a good worker is relevant to the issues of causation and damages in this case, Defendant's motion should be denied.

**X.      PLAINTIFF SHOULD BE ALLOWED TO PRESENT TESTIMONY THAT DEFENDANT SHOULD HAVE PROVIDED GATES AT THE CROSSING**

Defendant BNSF confuses the duty it owed to Plaintiff. Plaintiff owed the duty to provide a safe place to work. Defendant breached this duty by failing to provide crossing gates at the ultra-hazardous crossing. However, if the Court determines that Plaintiff needs to show a duty to erect crossing gates, then Plaintiff has met that burden too. Plaintiff refers and incorporates his Response as well as Defendant Avila's Response to BNSF's Motion for Summary Judgment.

The cases Defendant cites to support its assertion that Plaintiff must show a specific duty to erect crossings are Smith v. Kansas City Southern, 2008 WL 276394 (E.D. Tex. 2008) and Missouri Pacific Railroad Co. v. Cooper, 563 S.W. 2d 233. Both of these involved duties it owed to the motoring public, not the duty that the railroad owed to its employee.

### A.    BNSF'S GENERAL DUTY UNDER THE FELA TO PROVIDE A SAFE PLACE TO WORK

BNSF had duty to provide Plaintiff with a safe place to work.  Plaintiff should be allowed to argue that the failure to put gates made the crossing unsafe and thus Defendant breached there duty.

Plaintiff's claims against the BNSF arise under 45 U.S.C. 51 <u>et. seq.</u>, commonly referred to as the Federal Employers' Liability Act.  <u>Shenker v. Baltimore & O. R. Co.</u>, 374 U.S. 1, 7, 83 S.Ct. 1667, 1671 (1963).

In a general sense, the FELA imposes upon Defendant BNSF a continuing, <u>non-delegable</u> duty to provide Plaintiff with a safe place to work.  <u>Bailey</u>, 391 U.S. 350, 352 (1943).  As explained in 11 Am. Jur. Trials, <u>FELA Litigation</u>, §17 the railroad's duty under the FELA:

> . . . [I]s a duty that becomes more imperative as the risk increases.  Breach of this duty is probably the single most common ground for recovery in a FELA case.  The duty is not narrowly confined, <u>but extends to any form of defect that makes the place to work unsafe</u>. (Emphasis added).

The railroad's duty under the FELA also includes an obligation to conduct tests and make inspections to discover dangers, and the railroad will be held to have constructive notice of dangers it could have discovered through proper inspections.  See <u>*Beattie v. Elgin, J. & E. Ry. Co.*</u>, 217 F.2d 863 (7th Cir. 1954); <u>Williams v. Atlantic Coast Line R. Co.</u>, 190 F.2d 744 (5th Cir. 1951); <u>Sears v. Southern Pac. Co.</u>, 313 F.2d 489 (9th Cir. 1963).  The necessity for, and sufficiency of, the required inspections are issues for the jury.  See <u>Webb v. Illinois Central R. Co.</u>, 352 U.S. 512 (1956).

The railroad's <u>non-delegable</u> duty to provide its employees with a safe place to work extends to circumstances where such employees are required to work on or over property of a third party over which the employer has no control.  See <u>Shenker v. Baltimore & O. R. Co.</u>, 371

U.S. 1, 7 (1963); <u>Lockard v. Missouri Pac. R. Co.</u>, 894 F.2d 299, 303 (8th Cir. 1990); <u>Carter v. Union R. Co.</u>, 438 F.2d 208, 210-11 (3d Cir. 1971); *Payne v. Baltimore & O. R. Co.,* 309 F.2d 546 (6th Cir. 1962). In *Payne,* the court explained that the railroad employer:

> . . . [M]ay not legally delegate to another its duty to its employee, and thereby escape liability to such employee. This is the basis for the FELA. If defendant does delegate and relies upon the services of its agent to carry out its own duty, it may not shift its liability from itself to said agent when an employee seeks to hold it directly liable. <u>Under FELA the employer is the one owing the duty to the employee. The employee need not look elsewhere for his protection.</u> He has a right under FELA to rely on his employer and none other. When the employer delegates its duty, or abdicates its control, the employer takes the risk, not the employee.

309 F.2d at 549 (emphasis added). <u>See, also, Carter</u>, 438 F.2d at 210-11 (holding that the railroad's duty under the FELA "includes a responsibility to inspect the third party's property for hazards and to take precautions to protect the employee from possible defects, and is separate and distinct from any negligence that may be attributable to [the third party].").

In other words, under the FELA Defendant BNSF is liable not only for its own independent negligence in failing to inspect and determine the safety of the crossing for its employees, but also for any negligence on the part of others by reason of their failure to maintain the crossing in a reasonably safe condition.

**B.    DEFENDANT HAD A DUTY TO PROVIDE GATES AT THE EXTRA HAZARDOUS CROSSING**

The question of whether this crossing is extra hazardous is a jury question. <u>Missouri Pac. R. Co. v. Cooper</u>, 563 S.W.2d 233, 235 (Tex. 1978). In this case there is ample evidence for a jury to find that the crossing was extra hazardous and therefore the railroad had a duty to provide gates at the crossing. Several witnesses, both lay and expert, testify to the extra hazardous nature of this crossing, including, Mr. Burnhan - Plaintiff's expert in grade crossing accidents, Mr. Barrentine - Defendant Avila's expert on railroad crossings, Mr. Shmid - BNSF's director of

crossing safety, and Mr. Tim Barnett - an eye-witness to the accident

Mr. Burnham testified that several aspects of the crossing create adverse geometric effects and pulls the driver's attention away from the crossing. The adverse aspects are: 1) the narrow width of the driveway where the crossing is located; 2) the short length from the roadway to the nearest rail; 3) the aiming of the warning mechanisms lights; 4) inadequate, improper, and inadequately placed warning signs; and 5) the shack on the opposite side of tracks. [Ex. 4, Burnham Depo, 46:18-47:8]. These glaring problems are substantiated by the numerous prior collisions and near misses, photographs, and testimony.

Mr. Barrentine, PE, Defendant Avila's and Silva's railroad crossing expert, makes similar conclusions to Mr. Burnham. He notes the following conditions at the site which made the crossing unsafe: 1) continuous tree line located between Highway 178 and the BNSF mainline which obscured visibility; 2) No roadside advance warning sign; 3) a raised island and pothole upon entry to the crossing, restricting turn movement toward the Vanguard property entrance and requiring additional driver attention; 4) no pavement markings to indicate the existence of railroad tracks; 5) a short traffic storage area from Hwy 178 to the mainline track, requiring large vehicles to pull unusually close to the tracks in order to clear traffic from behind on Hwy 178; 6) a skewed vehicular orientation on approach to the tracks, due to the required hard right turn, generally restricting sight distance to the right for truck drivers; 7) the warning lights/bells were in need of alignment and the lenses need cleaning/replacement; 8) the absence of protective gate arms; 9) an obstructed gateway onto the property due to the shack which takes driver attention away from the crossing; 9) signage on the shack taking driver attention away from the crossing; and 10) a skewed entrance geometry into the Vanguard property requiring additional attention of drivers for maneuvering large vehicles. [Ex. 9, report of Barrentine, PE].

Mr. Barnett, an eye witness and a person familiar with performing the same turn with a semi-truck, confirms the difficulty of being able to look down the track after making the right hand turn. This difficulty is not present in normal crossings.

Defendant knew that the crossing was extra hazardous. As testified to by Mr. Schmid, Head of Crossing Safety for the BNSF, BNSF was aware of six prior crossing collisions at this location. This is reflected in BNSF's own internal records. Schmid also testified that the BNSF was aware of at least two close calls, one of which involved a gas truck - hazardous material. In addition to what was actually known by the BNSF, there were at least two other collisions at this crossing that the BNSF should have known about, as this information can be readily accessed directly from Federal Railroad Administration and/or on its government website.

BNSF asserts that provisions relied upon by experts Barrentine and Burnham contained within the Manual of Uniform Traffic Control Devices ("MUTCD") are inapplicable to "private" crossings within the scope of 23 C.F.R. § 655.603. However, BNSF's arguments miss the mark. Initially, BNSF provides no support for its conclusory observation that crossing at issue is a "private" crossing. Further, a reading of 23 C.F.R. § 655.603 actually belies BNSF's assertion. Specifically, 23 C.F.R. § 655.603 provides that the MUTCD applies to roads "that are privately owned but where the public is allowed to travel without accesses restrictions." 23 C.F.R. § 655.603. It is undisputed in the present case approximately 700 persons use the crossing every day. (Burnham Depo. 56:1-8). Further, no proof exists in the record that access to the road is restricted in any manner. Accordingly, BNSF's assertions to the contrary are untenable.

Further, the MUTCD and C.F.R.'s can be offered as proof that BNSF failed to provide a safe place to work. <u>Campbell v. Consolidated Rail Corp.</u>, 2009 WL 36889, 2 (N.D.N.Y.)

(N.D.N.Y.,2009); <u>Miller v. Chicago & N.W. Transp. Co.</u>, 925 F.Supp. 583, 587-88

(N.D.Ill.1996) ("[S]ome courts have allowed OSHA regulations to be admissible as evidence of

the standard of care in an FELA case even when there is no question that the OSHA regulations

were not applicable as such.... Hence [Plaintiff's expert] will be allowed to use OSHA's standards

as part of the basis for his opinion as to what a reasonable person [in the defendant's situation]

would do ...."), <u>Williams v. Ne. Ill. Reg'l Commuter R.R. Corp.</u>, 00-CV-2250, 2002 WL

1433724, at *5 (N.D.Ill. June. 28, 2002); <u>Manes v. Metro-North Commuter R.R.</u>, 801 F.Supp.

954, 964 (D.Conn.1992).  The MUTCD and C.F.R.'s are minimal guidelines for the safety of

crossings.  Defendant as a huge class I railroad with numerous public and private crossing is

aware of these requirements.

## XI.    PRIOR ACCIDENTS AND CLOSE CALLS ARE ADMISSIBLE

Plaintiff will refrain from attaching exhibits for this motion in limine.  Supporting

documentation is found in Plaintiff's Response to Defendant's Summary Judgment Motion and

in Defendant Avila's Response to BNSF's Motions in Limine.

BNSF asserts that evidence of prior accidents and/or close calls at the subject crossing

should be excluded because the prior accidents cannot be shown to be substantially similar.  A

review of these prior accidents, however, in light of applicable law reveals that evidence of the

prior accidents are appropriately admitted into evidence at trial of this matter. BNSF's motion to

the contrary should be denied.

In <u>Yoste v. Wal-Mart Stores, Inc.</u>, 822 So.2d 935, 936 (Miss. 2002) (citing Parmes v.

Illinois Cent. Gulf R.R., 440 So.2d 261, 264 (Miss.1983)) the court stated that: "Evidence of

prior accidents may be used to show two things-the existence of a dangerous condition and the

defendant's notice or knowledge thereof."  Evidence of prior accidents is admissible upon a

showing of substantial similarity of conditions. Id.

There have been at least eight prior collisions and two close calls (near collisions) at this crossing. One of the close calls involved hazardous materials - a gas truck. The prior collisions are documented in the form of Highway-Rail Grade Crossing Accident/Incident Reports made by the Department of Transportation Federal Railroad Administration. The near-misses have all been documented by BNSF. The authenticity of these records is not in dispute. Further, the records constitute business records within the scope of Fed. R. Evid 803(6) and/or Public Records and Reports pursuant to Fed. R. Evid. 803 (8). Accordingly BNSF cannot readily assert that these records may not be introduced for lack of authentication or hearsay problems.

The prior collisions and close calls are factually similar to this case. In December 2008, an "[e]ast bound pick-up truck stopped and then proceeded and train struck highway user on a dry pavement road while moving over crossing at 001 MPH." The train in that accident was traveling north, just as the train in the present accident. On June 17, 2005, a train (also going north), traveling at 48 miles per hour, struck a van moving over the dry crossing at 10 miles per hour." On September 22, 2004, a train traveling at 41 miles per hour struck a tractor-trailer moving at 5 miles per hour. (Id. p. 23). On April 27, 2004, a train traveling at 58 miles per hour struck a tractor-trailer while it was stopped on the crossing. (Id. p. 24). On October 3, 1989, a northbound train traveling at 38 struck a tractor-trailer moving over the crossing at 4 miles per hour. (Id. p. 25). On June 8, 1988 a northbound train traveling at 45 miles per hour struck a crossing automobile. (Id. p. 26). On April 5, 1982, a collision occurred between train and crossing automobile traveling at 10 miles per hour. (Id.)

In addition to the above-listed accidents, numerous close calls have taken place, also documented by BNSF.. Specifically, five close calls, occurring between April 23, 2001 and

September 13, 2007 have been documented by BNSF at this crossing. Four of these involve commercial vehicles such as the vehicle being driven by Mr. Avila on the day of the accident.

These numerous prior accidents and close-calls, documented by BNSF and the Federal Railroad Administration, clearly demonstrate the existence of a dangerous condition at the subject crossing and BNSF's notice or knowledge thereof. See Yoste v. Wal-Mart Stores, Inc., 822 So.2d 935, 936 (Miss. 2002). While BNSF asserts that it cannot be demonstrated that the conditions surrounding the prior accidents are similar enough to be relevant, BNSF ignores that the nature of the crossing itself is the common thread that makes the prior accidents relevant to the present case. Further, in many of the cases the train and/or vehicles were going in the same direction and at similar speeds.

Therefore, the prior accidents should be admissible to show notice and the dangerous nature of this crossing.

Respectfully Submitted:                    **Yaeger, Jungbauer & Barczak PLC**

Dated: 4/15/09                             By: /s/ Karl Frisinger
                                           Karl Frisinger
                                           Ronald Barczak
                                           745 Kasota Ave.
                                           Minneapolis, MN 55414
                                           (612) 333-6371

CERTIFICATE OF SERVICE

I, Karl Frisinger, one of the attorneys for the Plaintiff, do hereby certify that a copy of the foregoing electronically filed Plaintiff's Response Opposing Defendant BNSF's Motions in Limine on the parties listed below by First Class mail, postage prepaid, unless said party is a registered CM/EMF participant who has consented to electronic Notice and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

William C. Spencer, Jr.
Mitchell, McNutt & Sams, P.A.
P.O. Box 7120
Tupelo, MS 38802

Todd B. Murrah
Glassman, Edwards, Wade & Wyatt, P.C.
26 North Second Street
Memphis, Tennessee 38103

David Darnell
Scott Campbell
Law Offices of Scott C. Campbell
6750 Poplar Avenue, Suite 412
Germantown, TN 38138

Dated this the 15th of April, 2009          By: /s/ Karl Frisinger _____